UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 1:17-CR-10260-LTS |
| | ) | |
| QUANG PT LE | ) | |

**DEFENDANT'S SUPPLEMENTAL MOTION TO PRO SE MOTION (ECF NO. 302) FOR IMMEDIATE COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)[1]**

## I. INTRODUCTION

On February 13, 2018, Quang Le pleaded guilty to indictments of kidnapping (18 U.S.C. § 1201(a)(1)), conspiracy to collect extensions of credit by extortionate means (18 U.S.C. § 894(a)), and operating an illegal gambling business (18 U.S.C. § 1955). The Court later sentenced him on May 8, 2018 to 72 months' imprisonment on the kidnapping and extortion charges and a concurrent term of 60 months' imprisonment on the illegal-gambling charge, with concurrent three-year terms of supervised release on all three charges following his release from prison.[2] Mr. Le is now serving the committed portion of his sentence at FCI McDowell; his projected release date is October 2, 2022.[3]

A motion for compassionate release does not seek to relitigate the sentencing hearing. Rather, this motion asks the Court for compassionate release given Mr. Le's medical condition, a raging pandemic, and the

---

[1] On January 28, 2021, after counsel had already been appointed for that purpose, Mr. Le filed a Pro Se Motion for Compassionate Release (*see* ECF No. 302), for reasons unclear. This Court later allowed counsel's motion to file this supplement to Mr. Le's pro se motion.

[2] Mr. Le's codefendants, Vinh Huynh and Kim Nguyen, both of whom pleaded guilty to identical charges after Mr. Le did, were each sentenced to a year or less of committed time; both have long since been released.

[3] Mr. Le had previously been held at Moshannon Valley Correctional Center, but was recently transferred after the Bureau of Prisons declined to renew its contract with that facility. *See GEO's Moshannon Valley Correctional Facility Loses Federal Contract*, Courtier Express (Jan. 21, 2021), http://www.thecourierexpress.com/news/geos-moshannon-valley-correctional-facility-loses-federal-contract/article_c7896d80-0dc6-5cb4-a1b0-9bce70879317.html.

demonstrated inability of an overwhelmed federal prison system to keep him safe and well.

Indeed, that system has already failed him: shortly before Thanksgiving, Mr. Le was diagnosed with COVID-19, after presenting with fever, chills, muscle pain, headache, and loss of taste or smell. *See* Exhibit A (Quang Le Medical Records), at 8, 31. Although Mr. Le appeared to recover after some days, *see id.* at 2-26, he has more recently shown symptoms such as difficulty breathing, weakness, and memory loss. *See* ECF No. 302, at 5. Those symptoms are all consistent with what health experts have come to call "long haul" COVID-19,[4] and they suggest that his bout with the virus has left his health significantly compromised, perhaps permanently.[5]

Nor has the risk to Mr. Le from the virus peaked. Much is still unknown about COVID-19, but mounting evidence suggests that one can contract the virus again even after having it once already, so Mr. Le remains at risk for reinfection. Although a vaccine is now available, health experts are still unsure whether patients with "long haul" symptoms like Mr. Le can safely take it.[6] The virus is still present at FCI McDowell, where at last count two inmates and five

---

[4] *See, e.g.*, Anthony Komaroff, *The Tragedy of Long COVID*, Harvard Health Blog (Oct. 15, 2020), https://www.health.harvard.edu/blog/the-tragedy-of-the-post-covid-long-haulers-2020101521173.

[5] *See, e.g.*, Mayo Clinic, *COVID-19 (Coronavirus): Long-Term Effects* (Nov. 17, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351 (noting potential risk that COVID-19 may damage patient's heart, lungs, or brain, increasing risk of future complications related to those organs).

[6] *See* UC Davis Health, *Long Haulers: Why Some People Experience Long-Term Coronavirus Symptoms* (Feb. 8, 2021), https://health.ucdavis.edu/coronavirus/covid-19-information/covid-19-long-haulers.html ("Researchers still don't know much about what causes long hauler symptoms and why they experience such long-term effects. Our infectious disease experts say you should ask your physician before scheduling an appointment to get a COVID-19 vaccine.").

staff are infected,[7] and prison conditions still make it impossible to provide effective protection from the virus to inmates like Mr. Le in a carceral setting. And if Mr. Le does contract COVID-19 again, his diminished physical health likely puts him at greater risk for worse—potentially fatal—health outcomes next time around.

It need not be this way. Because he has exhausted all possible avenues for administrative release and otherwise qualifies for relief under 18 U.S.C. § 3582(c), this Court can authorize Mr. Le's immediate release to Dorchester, Massachusetts where his uncle, Hai Phi, as well as Mr. Le's parents, grandfather, and adult brother reside in a home that Mr. Phi owns. If Mr. Le is released, his family will be able to pick him up from McDowell, and he will self-quarantine for two weeks once released to ensure no spread of COVID-19 into the community if he is still infectious. To safeguard what remains of Mr. Le's health, the Court should order his immediate release.

## II. FACTUAL BACKGROUND

As mentioned, Mr. Le already fell ill to COVID-19 back in November 2020. On November 20, he reported to prison medical staff at Moshannon Valley Correctional Center, where he was then held, "I feel hot when I take a deep breath [and have] pain in my body." Exhibit A at 31. He presented with a high fever (nearly 103°F), and reported chills, repeated shaking, muscle pain, headache, fatigue and a recent loss of taste or smell. *Id.* The next day, he tested positive for COVID-19 and was quarantined until the end of November.

[7] *See* Bureau of Prisons, *BOP: COVID-19 Update*, https://www.bop.gov/coronavirus (accessed Mar. 16, 2021).

*Id.* at 8.

Although his condition appeared to improve over that time, *see id.* 9-26, more recently in his pro se motion Mr. Le has reported "worrisom[e] symptoms that are still affecting [him]," including "difficult[y] in breathing, memory los[s], extreme weakness, and more." ECF No. 302 at 5. All these appear consistent with what has come to be known in the medical community as "long haul" COVID-19. As the federal Centers for Disease Control and Prevention (CDC) explains, "some [COVID] patients can have symptoms that can last for weeks or even months after recovery from acute illness," and even some lucky enough to avoid hospitalization later report "experienc[ing] persistent or later symptoms." CDC, *Long-Term Effects of COVID-19* (Nov. 13, 2020).[8] Indeed, some medical experts worry about "[m]ore serious long-term complications" from the virus—including potential cardiovascular, respiratory, and even neurological damage—that these "long haul" symptoms may portend. *Id.*; Mayo Clinic, *supra* n.5 ("Although COVID-19 is seen as a disease that primarily affects the lungs, it can damage many other organs as well. This organ damage may increase the risk of long-term health problems.").

Mr. Le is still at risk from the virus. As mentioned, mounting evidence suggests that the risk of being reinfected with COVID-19—contracting the virus and overcoming it once, only to contract it *again*—is real. *See, e.g.*, Galit Perez, *et al.*, *A 1 to 1000 SARS-CoV-2 Reinfection Proportion in Members of a Large Healthcare Provider in Israel: A Preliminary Report* (Mar. 8, 2021).[9] Indeed, if

[8] https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html.
[9] https://www.medrxiv.org/content/10.1101/2021.03.06.21253051v1.

anything the risk of reinfection is likely *under*estimated, especially in the United States, because the number of confirmed cases of reinfection is "constrained by the limited number of U.S. labs that retain covid testing samples or perform genetic sequencing." JoNel Aleccia, *Why the U.S. Is Underestimating Covid Reinfection*, KHN (Feb. 8, 2021) ("A KHN review of surveillance efforts finds that many U.S. states aren't rigorously tracking or investigating suspected cases of reinfection.").[10] Federal courts likewise have begun to "recognize[ ] that the risk of re-infection from the virus is a significant concern." *United States v. Gould*, No. 1:17-cr-00150-JL, slip op. at 4 (D.N.H. Dec. 21, 2020) (collecting cases).

Simply put, that Mr. Le already battled the virus and won is no guaranty that he is now immune. That he now presents with "long haul" symptoms also makes vaccination a much more uncertain question: at least some health experts have recommended caution, since neither "long haul" COVID-19 nor the vaccines' potential effects on it are yet well understood. *See* UC David Health, *supra* n.6. And given the danger that COVID-19 has left Mr. Le's health compromised, perhaps with lasting systemic damage, Mr. Le is now at greater risk for much worse—perhaps even fatal—health outcomes should he contract the virus again.

That is especially true in a carceral setting such as FCI McDowell, given the endemic failure of prisons and jails to provide adequate health care, particularly to inmates with chronic conditions. *See, e.g.*, Andrew P. Wilper, *et al.*, *The Health and Health Care of US Prisoners: Results of a Nationwide Survey*,

[10] https://khn.org/news/article/why-the-u-s-is-underestimating-covid-reinfection/.

99 Am. J. Pub. Health 666 (Apr. 2009) (finding that "[m]any inmates with a serious chronic physical illness fail to receive care while incarcerated").[11] Indeed, Mr. Le's medical records show that several of his scheduled medical appointments were not held following his bout with COVID-19 at Moshannon Valley, citing COVID-related movement restrictions. *See* Exhibit A at 3, 5, 7. It is unknown whether the situation will prove materially better at FCI McDowell; Mr. Le's access to healthcare should not be left to chance in any case.

The carceral setting, of course, also makes it far more likely that Mr. Le *will* contract the virus again because, "[i]f the coronavirus were to design its ideal home, it would build a prison." Barbara Bradley Hagerty, *Releasing People from Prison Is Easier Said Than Done*, The Atlantic (July 8, 2020).[12] Two features make the spread of COVID-19 within prison a virtual inevitability: close quarters and asymptomatic transmission. The risk of transmitting COVID-19 also goes up with sustained contact such as by sharing the same air space for a prolonged time—exactly the setting for staff and detainees in correctional facilities like FCI McDowell.[13] And as the CDC has warned, "[a]s many as 25 percent of people infected with the new coronavirus may not show symptoms ... a startlingly high number that complicates efforts to predict the pandemic's course and strategies to mitigate its spread."[14] None of the Bureau of Prisons' (BOP) current

---

[11] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2661478/pdf/666.pdf.
[12] https://www.theatlantic.com/ideas/archive/2020/07/releasing-people-prison/613741/.
[13] Lidia Morawska, *et al.*, *It is Time to Address Airborne Transmission of Covid-19*, 71 Clinical Infectious Diseases 2311 (Nov. 2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa939/5867798.

[14] Apoorva Mandali, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders,* N.Y. Times (Mar. 31, 2020), https://nyti.ms/39DtaN5.

mitigation protocols accounts for these factors. Indeed, despite those measures, the disease continues to spread like wildfire in federal prisons. As of this writing, there have been 54,319 confirmed cases of COVID-19 within the BOP (47,733 inmates and 6,586 staff). 225 federal inmates have died from the virus. *Id.* In contrast, on May 6, 2020, there were 3,173 confirmed cases in BOP and 42 deaths. *See* BOP, *supra* n.7.

The only way to protect inmates like Mr. Le from the grave risks that COVID-19 presents is to comply with CDC recommendations for avoiding infection, especially (given the risk of asymptomatic transmission) social distancing.[15] Yet, as widely recognized, that guidance is almost impossible to follow in a carceral setting. *See, e.g.*, *Gould*, slip op. at 5 ("[C]ourts have found that prison is an environment that increases the likelihood of transmission of diseases including COVID-19."); Hagerty, *supra* n.12 ("Inmates are packed together day and night; social distancing, frequent hand-washing, and mask wearing are fantasies."). It is thus unsurprising that the spread of COVID-19 within BOP is almost double that of the rest of the country,[16] or that public health experts still maintain that, *even with an effective vaccination strategy now in place*, decarceration is mandatory if the lives of prisoners like Mr. Le are to be saved. *See* Bejamin A. Barsky, *et al.*, *Perspective: Vaccination Plus Decarceration—Stopping Covid-19 in Jails and Prisons*, New Eng. J. Med. (Mar. 3, 2021).[17]

[15] *See generally* CDC, *Prevent Getting Sick* (Jan. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html.
[16] *Compare* https://federaldefendersny.org/assets/uploads/BOP_Compared_to_U.S.4.20.pdf *with* https://federaldefendersny.org/assets/uploads/Rate_of_Infections.4.20.pdf. These charts were created by the Federal Defenders of New York based on CDC and BOP data.
[17] https://www.nejm.org/doi/full/10.1056/NEJMp2100609.

## III. ARGUMENT

### A. THIS COURT HAS BROAD AUTHORITY TO RESENTENCE MR. LE UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR "EXTRAORDINARY AND COMPELLING REASONS."

Under 18 U.S.C. § 3582(c)(1)(A)(i), as relevant here, this Court has the statutory authority to "reduce the term of imprisonment ... if it finds that ... extraordinary and compelling reasons warrant such a reduction."[18] What counts as "extraordinary and compelling reasons warrant[ing] such a reduction" is not self-evident from the text but derives its meaning from U.S. Sentencing Commission (Commission) guidance and the provision's history from its original enactment in the 1980s through the passage of the First Step Act in 2018.

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582(c), as part of the Comprehensive Crime Control Act of 1984. As originally enacted, Congress required the Director of BOP to move for the court to resentence the defendant; unless BOP did so, the sentencing court had no authority to modify a prisoner's sentence to effect a compassionate release. The original statute also left open what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c). Even so, the statute's legislative history suggested how Congress thought federal courts should use it. In particular, the Senate Report stressed that some cases, despite the abolition of federal parole, may warrant a second look at resentencing:

---

[18] The preceding quotation elides other statutory requirements, such as exhaustion and consideration of applicable sentencing factors under 18 U.S.C. § 3553(a), that are addressed separately below.

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. No. 98-225, at 55-56 (1983) (emphasis added).

Congress initially delegated responsibility for defining "extraordinary and compelling reasons" to the U.S. Sentencing Commission (Commission). *See* 28 U.S.C. § 994(t). After nearly a generation, the Commission finally fulfilled that mandate, issuing largely general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n. 1(A).

Even that broad definition, however, did little to spur BOP to seek relief for prisoners who might have met it. And after a Department of Justice (DOJ) Inspector General Report criticized the BOP for rarely using its statutory authority to seek reduced sentences, the Commission acted again in 2016 by amending its policy statement on "compassionate release." *See* U.S.S.G. § 1B1.13 Amend. (11/1/2016); *see also* U.S. DOJ, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program,* I-2023-006 (Apr. 2013). The 2016 policy statement both admonished the BOP for its inaction and broadened the eligibility criteria for sentencing courts. *See* U.S.S.G. § 1B1.13, n.4; *see also United States v. Dimasi*, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing history of the BOP, DOJ and Commission's

roles in developing guidance for "compassionate release" motions). To that end, the Commission expanded the list of "extraordinary and compelling reasons" for resentencing *beyond* medical illness, age, and family circumstances. *Id.,* n.1(A) (including catch-all category for "Other Reasons," to capture "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)").

Even so, the Commission's actions still failed to prompt the BOP to take a more active role on behalf of inmates satisfying the Commission's compassionate-release criteria. In fact, during the more than three decades that the BOP served as the gatekeeper for compassionate-release motions, it did almost nothing to carry out Congress's intent for § 3582(c) to provide a safety valve to correct injustices or allow relief for "extraordinary and compelling reasons."

In 2018, with the passage of the First Step Act, Congress finally remedied the BOP's dereliction. *See* P.L. 115-391, 132 Stat. 5194 (2018). Section 603 of the First Step Act changed the procedure for seeking compassionate release under § 3582(c)(1)(A): instead of trusting the BOP Director to determine whether "extraordinary and compelling reasons" support release, a court can now resentence "upon motion of the defendant," after the inmate has exhausted administrative remedies with the BOP, or after 30 days from the warden's receipt of the inmate's request for compassionate release, whichever happens first. 18 U.S.C. § 3582(c)(1)(A). Thus, under the First Step Act, a defendant need not secure the BOP's assent to obtain resentencing; instead, courts may consider the defendant's motion, even if the BOP opposes it, and

order resentencing under 18 U.S.C. § 3582(c)(1)(B).

This Court thus has relatively broad authority to resentence Mr. Le for "extraordinary and compelling reasons" if § 3582(c)(1)(A)'s procedural requirements are met. As explained in the following sections, they are.

### B. MR. LE HAS MET THE 30-DAY REQUIREMENT FOR EXHAUSTION OF ADMINISTRATIVE REMEDIES, AND IN ANY EVENT THE COURT CAN WAIVE THEM UNDER 18 U.S.C. § 3582(c)(1)(A) BECAUSE OF THE URGENT RISK OF FATAL INFECTION

As mentioned, under § 3582(c)(1)(A), inmates ordinarily must either wait at least thirty days after the warden's receipt of a compassionate release request, or exhaust all administrative remedies before going to court, whichever happens earlier. *See* 18 U.S.C. § 3582(c)(1)(A). As stated in his pro se motion, Mr. Le satisfied that requirement by submitting requests for release to the warden or warden's designee at Moshannon Valley (where he previously was held) in December 2020. *See* ECF No. 302, at 3. At least one of those requests appears to have been denied in early January, *see id.*, Mr. Le's pro se motion was filed at least 30 days after the earlier request, and this supplemental motion is filed well after both in any event. The statutory exhaustion requirement is thus met.

In any event, however, the Court may waive the requirement consistent with longstanding precedent.[19] Courts have forgiven failures to exhaust, for example, when "'special circumstances' have been plausibly alleged that 'justify

---

[19] The exhaustion requirement under the First Step Act is not jurisdictional. Like analogous provisions of 28 U.S.C. § 2241 and the Prison Litigation Reform Act, § 3582(c)(1)(A) "lacks the 'sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion requirements.'" *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003) (citation omitted); s*ee also Atkinson v. Linaweaver*, No. 13 CIV. 2790 JMF, 2013 WL 5477576, at *1 (S.D.N.Y. Oct. 2, 2013) ("In a case brought pursuant to Section 2241, exhaustion ... does not go to the Court's jurisdiction to adjudicate the dispute").

the prisoner's failure to comply with administrative procedural requirements.'" *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) (citation omitted); *accord Carmona v. U.S. Bur. of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001). Courts also "excuse the exhaustion requirement if a petitioner demonstrates that pursuing appeals through the administrative process would be futile or that the appeals process is inadequate to prevent irreparable harm to the petitioner." *United States v. Khan*, 540 F. Supp. 2d 344, 350 (E.D.N.Y. 2007).[20]

Both reasons—futility and the potential for irreparable harm—favor waiving the 30-day exhaustion period for Mr. Le. As discussed above, Mr. Le seeks emergency relief here to avoid contracting COVID-19 again and suffering serious, even fatal complications from the disease. Each day that he remains imprisoned at FCI McDowell, where the virus has already entered the facility, is another day that he remains at high risk of contracting it, with potentially deadly consequences. Waiting for Mr. Le to exhaust administrative remedies would only increase his risk of exposure to COVID-19, and with it the risk that any resentencing would come too late.

It is honestly hard to imagine a starker example of "irreparable harm."

---

[20] The First Step Act has not abrogated these principles, *see United States v. Bolino*, No. 06-CR-0806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020), and federal courts across the country have continued to waive administrative exhaustion requirements under the First Step Act when appropriate. *See, e.g.*, *Washington v. Bur. of Prisons*, No. 1:19-CV-01066, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (recognizing that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile" in addressing motion for recalculation of good time credit under First Step Act); *United States v. Walker*, No. 3:10-cr-00298-RRB-1, slip op. at 1 (D. Or. Feb. 7, 2019) (finding that, despite failure to exhaust administrative remedies, jurisdiction lay to order recalculation of defendant's good time credit under the First Step Act and order release if term of imprisonment had expired); *see also Gurzi v. Marques*, No. 18-CV-3104- NEB-KMM, 2019 WL 6481212, at *2 (D. Minn. Oct. 10, 2019) (recognizing that "the Court … has the authority to proceed to the merits of the case rather than rely on a failure to exhaust when appropriate" before addressing prisoner's objections to his designation, in part under First Step Act).

For that reason, many courts have recently granted compassionate release for inmates in situations like Mr. Le's, irrespective of any failure to exhaust. *See, e.g.*, *United States v. Colvin*, 451 F. Supp. 3d 237, 240 (D. Conn. 2020); *United States v. Perez*, 451 F. Supp. 3d 288, 292-93 (S.D.N.Y. 2020). This Court should do the same.

## C. THE CONDITIONS OF BOP INCARCERATION FOSTER THE SPREAD OF COVID-19, AND MR. LE'S MEDICAL CONDITION RENDERS HIM SUSCEPTIBLE TO AN INTOLERABLE RISK

As discussed earlier, the conditions endemic to correctional facilities like FCI McDowell create an ideal environment in which contagious viruses like COVID-19 can spread. Public health experts are unanimous in their consensus that incarcerated individuals "are at special risk of infection, given their living situations" and "may also be less able to participate in proactive measures to keep themselves safe," and they agree as well that "infection control is challenging in these settings."[21]

Within such a setting, Mr. Le has no way to take the prophylactic self-care measures that the CDC recommends for staying safe from COVID-19 infection. He cannot self-quarantine or partake in "social distancing" at FCI McDowell. He lives in a high-density custodial setting, precisely the kind of spaces that caused alarmingly high spread rates of COVID-19 in New York City during the height of infections there.[22] Hand sanitizer, recommended by the

---

[21] *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020), at 4, https://bit.ly/2W9V6oS.

[22] *White House Tells Travelers from New York to Isolate as City Cases Soar*, N.Y. Times (Mar. 24, 2020), at https://www.nytimes.com/2020/03/24/nyregion/coronavirus-new-york-update.html.

CDC to reduce transmission, is *prohibited* in jails and prisons because of its alcohol content.[23] Health experts worry that no matter what precautions are taken in crowded prisons, these facilities may become incubators for the COVID-19 disease.[24] That certainly proved true during the 2009 H1N1 epidemic: many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent widespread infection.[25] For all these reasons, the Prison Policy Initiative has called on American jails and prisons to release medically fragile and older adults, noting that these persons are at high risk for serious complications and even death from COVID-19.[26]

Again, Mr. Le remains at risk for reinfection, his "long haul" symptoms raise serious questions about the safety of vaccinating him, and given that COVID-19 may well have wrought lasting damage to his health, there is ample reason to worry that he will not be as lucky if infected again. Given all that, plus the impossibility of protecting him from the virus while he remains imprisoned, the Court should grant Mr. Le compassionate release.

## D. THE RELEVANT § 3553(a) FACTORS FAVOR COMPASSIONATE RELEASE

In considering a motion for compassionate release, 18 U.S.C.

---

[23] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?," *ABA Journal* (March 13, 2020), available at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain- coronavirus.

[24] Michael Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[25] "Prisons and Jails are Vulnerable to COVID-19 Outbreaks," *The Verge* (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.

[26] Peter Wagner & Emily Widra, *No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform*, Prison Policy Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic.

§ 3582(c)(1)(A) directs courts also to take into account "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable." Here, a review of the Section 3553(a) factors and Mr. Le's release plan of home confinement for the unserved portion of his original term of imprisonment all favor granting him compassionate release under the First Step Act of 2018 and the CARES Act of 2020.

Mr. Le's diminished health, combined with the COVID-19 crisis, provides ample justification for the Court to conclude that his current personal history and characteristics favor resentencing under the § 3553(a) factors. The same conditions also show indicate that Mr. Le poses no credible threat to the safety of the public if he were now released to home confinement.

Releasing Mr. Le due to the "extraordinary and compelling reasons" presented by the current threat of a novel contagion also would not diminish the seriousness of the offenses of conviction, but it would honor Congress's intent to offer courts greater flexibility to reduce sentences when changed circumstances justify a second look. Mr. Le's diminished physical health and the existence of the COVID-19 virus within the facility where he is held, together with his inability to take the precautions the CDC recommends for remaining safe during the outbreak, warrant a reduced sentence in his case.

Finally, Mr. Le has a viable release plan. Upon his release, Mr. Le can live with his uncle, Hai Phi, at the home that Mr. Phi owns in Dorchester, Massachusetts. Mr. Phi is committed to supported Mr. Le's rehabilitation and has the financial means to provide for his physical needs. Other members of Mr. Le's immediate family—including both of his

parents, Long Le and Nhung To, his grandfather John Vinh Le, and his adult brother Duy Le—would also reside at the house and provide Mr. Le with the emotional support to facilitate his rehabilitation.

To be sure, Mr. Le has been convicted of a violent offense (kidnapping), and the seriousness of that offense cannot be minimized. At the same time, however, it bears repeating that two of Mr. Le's co-defendants were charged with exactly the same crime, both have already completed their terms of imprisonment, and Mr. Le has already served more prison time for that crime than both of them combined. To counsel's knowledge, his behavior while imprisoned has been exemplary. His serious medical vulnerability should assuage any residual concern this Court might have about whether Mr. Le poses any threat to the community. He does not.

## IV. CONCLUSION

For these reasons, Mr. Le has shown compelling reasons that warrant a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A). Mr. Le poses no danger to any other person or the community, and the § 3553(a) factors support a reduction. Mr. Le therefore asks that the Court grant this motion and order his compassionate release by either reducing his term to time served, starting supervised release, or ordering home confinement for the balance of his term until October 2, 2022.

Respectfully Submitted,

Date: 03/13/2021

/s/ Vivianne Jeruchim______

Vivianne Jeruchim, Esq.
BBO #547598
Jeruchim & Davenport, LLP
50 Congress St., Suite 615

Boston, MA 02109
617/720-6047

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participant on March 13, 2021.

Date: 3/13/2021 /s/ Vivianne Jeruchim______